# In the United States Court of Federal Claims

No. 21-1861C
Filed Under Seal: December 28, 2021
Unsealed and Refiled: January 10, 2022[1]

```
*************************************
                                    *
SUPPLYCORE INC.,                    *
                                    *
                Plaintiff,          *
                                    *
        v.                          *
                                    *
THE UNITED STATES,                  *
                                    *
                Defendant.          *
                                    *
        and                         *
                                    *
NOBLE SALES CO., INC., d/b/a        *
NOBLE SUPPLY AND LOGISTICS,         *
                                    *
        and                         *
                                    *
PAE-IMK INTERNATIONAL, LLC,         *
                                    *
            Defendant-Intervenors.  *
                                    *
*************************************
```

## OPINION AND ORDER

**DAMICH**, Senior Judge

On September 15, 2021, Plaintiff SupplyCore, Inc. ("Plaintiff"), filed this post-award bid protest challenging the United States Government's ("Government") award of two contracts under request for proposals ("RFP") No. SPE8E3-19-R-0001, issued by the Defense Logistics Agency – Troop Support ("DLA"). The RFP concerns a program related to DLA's construction and equipment supply chain – called "Maintenance, Repair and Supply Operations" ("MRO") for the United States military in the Pacific Region. The two contracts reflect a division of the

---

[1] This Court's sealed Opinion and Order, issued on December 28, 2021, directed the parties to file redactions "within ten (10) days." ECF No. 37 at 22. Supplycore, Inc., Noble Sales Co., PAE-IMK International, LLC, and the Government jointly agreed on the redactions herein.

Pacific into two zones: Zone 1 comprises Japan, Okinawa, Singapore, Diego Garcia, the Philippines, and Thailand, and Zone 2 comprises the Republic of Korea. SupplyCore challenges DLA's May 13, 2021 award of the Zone 1 Contract to Defendant-Intervenor, Noble Supply & Logistics ("Noble), and the award of the Zone 2 Contract to Defendant-Intervenor, PAE-IMK International, LLC ("PAE").

Concerning Zone 2, SupplyCore argues successfully that a finding of "meaningful discussions" between DLA and SupplyCore is contaminated by DLA's representations to SupplyCore and PAE. DLA informed awardee PAE that its proposed Round 3 distribution fee price XXXXXXXXXXXXXXXXXXX "**cannot be determined fair and reasonable,**" but conveyed no such message in response to SupplyCore's Round 3 distribution fee price XXXXXXXXXXXXXXXX. On top of this, despite DLA's warning to PAE about its pricing, DLA then awarded the contract to PAE even though PAE declined to lower its putatively unreasonable pricing.

Concerning Zone 1, SupplyCore argues that DLA's reasonableness evaluation was arbitrary and capricious because the agency either (A) failed to conduct a reasonableness analysis or (B) conducted such an analysis, but failed to find SupplyCore's pricing unreasonable.[2] SupplyCore additionally contends that discussions were inadequate because its pricing constituted a "significant weakness," triggering a notification requirement to which DLA did not adhere. However, the Government convincingly responds that SupplyCore's pricing could reasonably be regarded as high, but not unreasonably high, reflecting SupplyCore's chosen approach and business judgment.

The Court issued an order on September 20, 2021 granting (A) Plaintiff's Motion to Seal and (B) the Parties' proposed briefing schedule. ECF No. 16. On October 15, 2021, the Government filed the Administrative Record ("AR") under Seal, and then re-filed part of the AR on November 2, 2021. ECF No's 23-24, 28.

On November 4, 2021, Plaintiff filed its Motion for Judgment on the Administrative Record. ECF No. 29. The Defendant and the two Defendant-Intervenors (Noble and PAE) each filed Cross Motions for Judgment on the Administrative Record on November 23, 2021. ECF No's 30-32. The case was fully briefed as of December 8, 2021.

After careful consideration, and for the reasons set forth below, the Court **GRANTS** Plaintiff's Motion for Judgment on the Administrative Record with respect to the Zone 2 Contract and accordingly **GRANTS** Plaintiff's requested Injunction. The Court **DENIES** Plaintiff's Motion for Judgment on the Administrative Record with respect to the Zone 1 Contract. Therefore, the Court **DENIES** Defendant's Cross Motion for Judgement on the Administrative Record with respect to the Zone 2 contract and **GRANTS** Defendant's Motion with respect to the Zone 1 contract. The Court further **DENIES** Defendant-Intervenor PAE's

---

[2] Ordinarily, a contractor would not want its pricing to be found unreasonable. However, in the event the contracting officer finds the pricing to be unreasonable, the contractor could request discussions with the contracting officer to justify its price or the contractor could adjust its pricing based on the unreasonable finding.

Cross Motion for Judgment on the Administrative Record and **GRANTS** Defendant-Intervenor Noble's Motion for Judgment on the Administrative Record.

Because of the distinctions between the two contracts and the grant of an Injunction with respect to the Zone 2 Contract, this opinion presents the facts and discussion regarding Zone 2 first, followed by the facts and discussion concerning Zone 1.

## I.     Standard of Review

### A.  Standard for Motion for Judgment on The Administrative Record

This Court decides a motion for judgment upon administrative record pursuant to RCFC 52.1.  The Court determines whether "given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356-57 (Fed. Cir. 2005).  "[T]he judgment on an administrative record is properly understood as intending to provide for an expedited trial on the record." *Id.* at 1356.

### B.  Bid Protest Standard of Review

In a bid protest, the trial court "review[s] the agency's decision pursuant to the standards set forth in section 706 of Title 5," the Administrative Procedure Act ("APA").  28 U.S.C. § 1491(b)(4); *see Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004).   An APA challenge requires showing that the agency action in question is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 n.5 (Fed. Cir. 2001).  Accordingly, "[a] bid award may be set aside" if (1) "the procurement official's decision lacked a rational basis" or (2) "the procurement procedure involved a violation of regulation or procedure." *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020) (quoting *Impresa*, 238 F.3d at 1332).  The APA also requires that "due account shall be taken of the rule of prejudicial error." 5 USC 706.  So, "[t]o prevail in a bid protest, a protestor must show a significant, prejudicial error in the procurement process." *WellPoint*, 953 F.3d at 1377 (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)); *see also Bannum*, 404 F.3d at 1351.

In reviewing the agency's procurement decisions, the Court does not substitute its judgment for that of the agency.  *Redland Genstar, Inc. v. United States*, 39 Fed. Cl. 220 (1997); *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 663, 672 (1997); *see also M.W. Kellogg Co. v. United States*, 10 Cl. Ct. 17, 23 (1986) (holding that "deference must be afforded to an agency's . . . procurement decisions if they have a rational basis and do not violate applicable law or regulations.").  The disappointed bidder "bears a heavy burden," and the contracting officer is "entitled to exercise discretion upon a broad range of issues confronting [her]." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citations and quotes omitted).  This burden "is not met by reliance on [the] pleadings alone, or by conclusory allegations and generalities." *Bromley Contracting Co. v. United States*, 15 Cl. Ct. 100, 105 (1988); *see also Campbell v. United States*, 2 Cl. Ct. 247, 249 (1983).  A procurement decision is rational if "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Impresa*, 238 F.3d at 1333. But "that explanation need not be

extensive." *Bannum, Inc. v. United States*, 91 Fed. Cl. 160, 172 (2009) (*citing Camp v. Pitts*, 411 U.S. 138, 142-43 (1973)).

The Court's "highly deferential" review such that "the disappointed offeror bears a 'heavy burden' of showing that the award decision 'had no rational basis' is particularly the case with respect to matters requiring technical judgment. *See, e.g., Benchmade Knife Co., Inc. v. United States*, 79 Fed. Cl. 731, 740 (2007) ("Agencies are entitled to considerable discretion and deference in matters requiring exercise of technical judgment."); *Beta Analytics Int'l, Inc. v. United States*, 67 Fed. Cl. 384, 395 (2005) ("the minutiae of the procurement process . . . involve discretionary determinations of procurement officials that a court will not second guess.") (quoting *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)). The protester's mere disagreement with the agency's assessment is not "nearly enough" to demonstrate arbitrary and capricious agency action. *See CRAssociates, Inc. v. United States*, 102 Fed. Cl. 698, 717-18 (2012).

## II.     Zone 2 Contract: Agency Evaluation

Under the terms of the solicitation, the DLA would evaluate proposals using three factors: (1) Technical Merit (subfactors: (i) Product Sourcing, (ii) Distribution and Delivery, and (iii) Customer Support), (2) Past Performance/Confidence Assessment and (3) Price. AR 304-05. Offerors were further instructed that "non-price evaluation factors were significantly more important than price; however, as the non-price ratings of offerors became more equivalent, price became more important." AR 303-04.

The DLA received five timely offers for the Zone 2 contract. The DLA determined that all five Zone 2 offerors would be included in the competitive range. AR 2031; AR 2093. Discussions followed, during which offerors for Zone 2 were asked to validate or improve their pricing. *See* AR 2081-93; 4370-4388; *see also* AR 4579-80 (PNM, Zone 2).

The DLA conducted three rounds of discussions with each Zone 2 offeror. *See, e.g.,* AR 4370-4388; *see also* AR 3108-12; 3126-29; 3147-52; 3706-3725; 3728-65. XXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX[3] XXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX. AR 3270-4388. SupplyCore's Round 3 Distribution fees totaled XXXXXXXXXXX, while PAE's totaled XXXXXXX – a disparity of approximately XXXXXXX. AR 4385.

Pertinent to this, in Round 3 of the discussions, DLA advised PAE:

➢ **Distribution Matrix (Drop Ship):**
  • Please ensure pricing is accurate for all distribution fee tiers. The distribution matrix (drop ship) pricing appears to be significantly unbalanced across the various

---

[3] Drop-shipped material is material delivered by a prime vendor's supplier directly to the Government customer. AR 240. In a prime vendor supported delivery (*i.e.*, non-drop ship), the prime vendor acts as middleman, receiving material from its supplier, then shipping it to the Government customer. *Id.*

fee tiers. Please take note of FAR 15.404-1(g)(3)("An offer may be rejected if the contracting officer determines that the lack of balance poses an unacceptable risk to the Government.")

- Pricing Period 1
  - Please improve pricing for the following distribution fee tiers: XXXXX XXXX. **Please note that the pricing proposed for tiers** XXXXXXX **specifically cannot be determined fair and reasonable.**

- Pricing Period 2
  - Please improve pricing for the following distribution fee tiers: XXXXX XXXX. **Please note that the pricing proposed for tiers** XXXXXXX **specifically cannot be determined fair and reasonable.**

- Pricing Period 3
  - Please improve pricing for the following distribution fee tiers: XXXXX XXXXX. **Please note that the pricing proposed for tiers** XXXXXX **specifically cannot be determined fair and reasonable.**

➢ **Distribution Matrix (Non-Drop Ship):**
- Please ensure pricing is accurate for all distribution fee tiers. The distribution matrix (non-drop ship) pricing appears to be significantly unbalanced across the various fee tiers. Please take note of FAR 15.404-1(g)(3)("An offer may be rejected if the contracting officer determines that the lack of balance poses an unacceptable risk to the Government.")

- Pricing Period 1
  - Please improve pricing for the following distribution fee tiers: XXXXXXX XXXXXXXXXXXXXX. **Please note that the pricing proposed for tiers** X XXXXXXX **specifically cannot be determined fair and reasonable.**

- Pricing Period 2
  - Please improve pricing for the following distribution fee tiers: XXXXXXXX XXXXXXXXXXXXXX. **Please note that the pricing proposed for tiers** XXXXXXXXX **specifically cannot be determined fair and reasonable.**

- Pricing Period 3
  - Please improve pricing for the following distribution fee tiers: XXXXXXXX XXXXXXXXXXXXXXX. **Please note that the pricing proposed for tiers** XXXXXXXXXX **specifically cannot be determined fair and reasonable.**

AR 3744-45.

In contrast, DLA advised SupplyCore:

➢ **Distribution Matrix (Drop Ship):**

- Pricing Period 1
  - Please review and improve pricing on XX distribution fee tiers.

- Pricing Period 2
  - Please review and improve pricing on XX distribution fee tiers.

- Pricing Period 3
  - Please review and improve pricing on XX distribution fee tiers.

➢ **Distribution Matrix (Non-Drop Ship):**
  - Pricing Period 1
    - Please review and improve pricing on XX distribution fee tiers.

  - Pricing Period 2
    - Please review and improve pricing on XX distribution fee tiers.

  - Pricing Period 3
    - Please review and improve pricing on XX distribution fee tiers.

AR 3748-49. Thus, in contrast to PAE, SupplyCore was not advised that its distribution fee pricing "**cannot be determined fair and reasonable**" even though its distribution fee price was XXXXXXX higher than PAE's. *See id*. The Round 3 warning to PAE about its distribution fee prices is also somewhat surprising because PAE's Round 3 distribution fee price was essentially identical to Rounds 1 and 2. *See* AR 4378; 4381; 4385.

Then, despite DLA's Round 3 warning to PAE that some of its distribution fees "cannot be determined fair and reasonable," PAE declined to reduce its distribution price, submitting an identical final distribution price of XXXXXXXX (and was awarded the contract in any case). AR 4388. SupplyCore, which was only advised to "improve" its pricing, submitted a final distribution fee of XXXXXXXXXXXXXXXXXXXXXXXX. *Id*.

The Source Selection Authority's ("SSA") Factor 1 (Technical Merit) analysis ascribed "good" ratings to both PAE and SupplyCore. *See* AR 4570. Underpinning the Technical Merit analysis, PAE and SupplyCore received matching "Good," "Good," and "Acceptable" ratings for Subfactors 1(a-c). AR 4765. SupplyCore had a better rating than PAE on Past Performance: "Substantial Confidence" in the case of SupplyCore, "Satisfactory Confidence" in the case of PAE.

|  | PAE-IMK | SupplyCore |
|---|---|---|
| **TECHNICAL MERIT** | GOOD | GOOD |
| **(a) Product Sourcing** | Good | Good |
| **(b) Distribution and Delivery** | Good | Good |

| (c) Customer Support | Acceptable | Acceptable |
|---|---|---|
| **PAST PERFORMANCE CONFIDENCE ASSESSMENT** | SATISFACTORY CONFIDENCE | SUBSTANTIAL CONFIDENCE |

*See* AR 4570.

However, the SSA also found that XXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.  AR 4766-67.  Although SupplyCore
registered a higher Factor 2 performance confidence assessment than PAE, PAE's Total
Evaluated Price ("TEP") of $17.3 million was far below SupplyCore's TEP of XXXXX;
therefore, the SSA determined that SupplyCore's higher past performance rating did not justify
paying a XXXX percent premium above PAE's price.  AR 4768, 4772.  SSA thereby awarded
PAE the Zone 2 contract over SupplyCore.  *Id.*

## III.   Zone 2 Contract: Discussion

### A.  The Agency's Round 3 Instruction to PAE Violates the Requirement for Meaningful Discussions.

FAR 15.306(d)(3) mandates that when Government contracting officers engage with
bidders, such discussions must be meaningful, "[a]t a minimum, . . . indicat[ing] to or
discuss[ing] with, each offeror still being considered for award, deficiencies, [and] significant
weaknesses."  In addition, FAR § 15.306(e)(1) prohibits government personnel from engaging in
conduct that "[f]avors one offeror over another, [such as when an agency] tells some offerors, but
not others, that their prices were high."  *AshBritt, Inc. v. United States*, 87 Fed. Cl. 344, 372
(2009).  Therefore, "[t]he Government may not inform some offerors of a concern with their
pricing level while staying silent with respect to identical issues in other offerors' proposals."
*AshBritt, Inc. v. United States*, 87 Fed. Cl. 344, 372 (2009) (citing *Multimax, Inc.*, No. B-
298249.6, 2006 Comp. Gen. Proc. Dec. P 165, 14-15 (Oct. 24, 2006) (finding price discussions
unequal where the agency advised some offerors that prices were high in comparison with the
Independent Government Estimate while not advising others whose prices were even higher)).
In *AshBritt*, the agency warned the eventual awardee that its line-item prices were excessive,
"suggest[ing]" that the awardee lower its prices, while the protester, whose prices were even
higher than those of the awardee, did not receive such notice from the agency.  *AshBritt, Inc.*, 87
Fed. Cl. at 372.

While *AshBritt* requires that agencies may not tell some offerors but not others that their
prices were excessively high, disparate prices may be found reasonable or unreasonable relative
to their distinctive technical approaches – in other words, hypothetically, if Proposal A is $12
million and Proposal B is $40 million, an agency may possibly find that the price of Proposal A
is unreasonably high while finding the price of Proposal B reasonable.  *See DynCorp Int'l, LLC
v. United States*, 10 F.4th 1300, 1316-17 (Fed Cir. 2020) (finding that disparate prices may be
found reasonable or unreasonable relative to different technical approaches, and that proposal-to-
proposal price comparisons are not required).

The fact pattern of the Zone 2 contract awards process resembles that in *Ashbritt*: the protestor's (SupplyCore's) prices were higher than those of the awardee (PAE), but the agency (DLA) warned the awardee and not the protestor of excessive pricing.  In Round 3, DLA directed both bidders to improve their pricing, but distinctively warned only PAE, in boldface, that its distribution fee price XXXXXXXXX "**cannot be determined fair and reasonable,**" without transmitting such a warning to SupplyCore, whose distribution fees were XXXXXXX.  *See* AR 3744-45; 3748-49; 4385.

In their respective briefs, the parties present arguments about the significance of an agency directing bidders to "improve" pricing.  SupplyCore construes the "improve" instruction as a routine bargaining communication interpreted by SupplyCore as conveying "that it was in the hunt and that making minor reductions was all that was needed to position it for award."  *See* ECF No. 29 at 16-17.  SupplyCore also points out the high frequency with which this instruction was conveyed to bidders in this case (for both Zone 1 and Zone 2) and thereby contends that "it cannot be argued by the Agency that the requests for reduced pricing were intended to convey to SupplyCore that its pricing was unreasonably high or that significant reductions were required in order for SupplyCore to be competitive for award."  ECF No. 29 at 17.  Conversely, the Government and defendants-intervenors take the position that DLA advising SupplyCore to "improve" many of the prices underlying components of its bid fully indicated to SupplyCore that its pricing was too high.  *See, e.g.*, ECF No. 31 at 24.

While both of these arguments about the relative significance of the "improve" pricing instruction may have merit, separately, the clear warning, in boldface, that pricing "**cannot be determined fair and reasonable,**" is an evident instruction that a bidder's pricing is outside viable contention.  Furthermore, this instruction was sent to PAE and not to SupplyCore even though SupplyCore's price was XXXXXX higher.  In addition, in spite of DLA's clear warning to PAE that its distribution pricing could not be found reasonable, PAE held firm in its prices, declining to make further reductions for the final bid submission.  *See* AR 4385-88.  Then, despite PAE evidently disregarding the warning, the agency then awarded the contract to PAE.  These two facts *together* – (1) the Round 3 warning sent to PAE and not to SupplyCore and (2) the award to PAE despite the fact that it declined to respond to the warning of an unreasonably high price – lead this Court to hold that DLA's award to PAE was arbitrary and capricious.[4]

In its reply brief, the Government dismisses SupplyCore's argument regarding the requirement for "meaningful discussions" as a "new argument" which may not be raised for the first time in a reply brief.  ECF No. 35 at 15.  Specifically, SupplyCore argued that DLA's Round 3 warning to PAE did not qualify under the requirement for meaningful discussions.

---

[4] To reiterate, the Court recognizes that distinctions between the respective technical approaches of offerors could possibly explain and justify DLA sending an "unreasonable price" notice to PAE and not to SupplyCore even though SupplyCore's price was XXXXXXXXXXX. *See DynCorp Int'l, LLC v. United States*, 10 Fed. 4h 1300, 1316-17 (Fed Cir. 2020) (finding that disparate prices may be found reasonable or unreasonable relative to different technical approaches, and that proposal-to-proposal price comparisons are not required).  However, in Zone 2, this occurred in conjunction with PAE disregarding the "unreasonable" price notice and not reducing its price in response, and then being awarded the contract anyway.

While it is true that SupplyCore's opening brief did not allege "unequal discussions" or quote the DLA's warning to PAE, SupplyCore's brief does raise the issue of "misleading" discussions, and widely contends that the instruction to "improve" pricing did not adequately notice SupplyCore about the viability of its distribution fees (with a citation including the pages of the Administrative Record containing the Round 3 PAE distribution fee warning).  ECF No. 29 at 17.  In effect, the Government asks this Court to assess SupplyCore's opening brief arguments that meaningful discussions were not held while disregarding the fact of the warning to PAE. Such an approach would exalt form over function.  Also, because this proceeding reflects two rounds of briefs, the Government has had a reasonable opportunity to respond to SupplyCore's reply brief.

Challenging a procurement award requires a showing that the agency action in question was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A).  The Court holds that DLA's Round 3 unreasonable price warning to PAE and not to SupplyCore plus DLA's award to PAE despite the fact that PAE declined to respond to the unreasonable price warning amounts to an arbitrary and capricious award decision.

### B.  Finding of Prejudice and Award of Injunction

To establish prejudice, the protestor must demonstrate that there was a "substantial chance" it would have received the award but for the errors in the procurement process. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1355 (Fed. Cir. 2005).

The administrative record confirms that per the solicitation, price became an issue for the Zone 2 contract because the PAE and SupplyCore bids were otherwise close.  PAE and SupplyCore received matching "good" ratings for Factor 1, XXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.  AR 4766-67.  Then SupplyCore registered a higher Factor 2 (performance confidence) rating than did PAE.  AR 4570.  This apparent proximity between PAE and SupplyCore raised the issue of price: the solicitation stated that "as the non-price ratings of offerors became more equivalent, price became more important."  AR 303-04.  The SSA thereby determined that SupplyCore's higher performance rating did not justify paying a XXXX percent premium over PAE's price.  AR 4768, 4772.  The apparent role played by price in awarding the Zone 2 contract to PAE over SupplyCore certainly suggests that had SupplyCore received a similar warning that its distribution pricing "**cannot be determined fair and reasonable**" and responded, SupplyCore would have had a "substantial chance" to qualify for the award.  The misaligned feedback to SupplyCore and PAE plus the award to PAE despite the Round "unreasonable price finding" discussions prejudiced SupplyCore.

To obtain a permanent injunction, a party must show that: (1) it has succeeded on the merits; (2) it will suffer irreparable harm if such relief is not granted; (3) the balance of the hardships tips in the movant's favor; and (4) an injunction will serve the public interest. *See Hawpe Constr., Inc. v. United States*, 46 Fed. Cl. 571, 582 (2000), *aff'd*, 10 F. App'x 957 (Fed Cir. 2001). No one factor is dispositive, and "the weakness of the showing regarding one factor may be overborne by the strength of the others." *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed Cir. 1993).

Because SupplyCore succeeds on the merits, the Court grants a Permanent Injunction for the Zone 2 contract.

## IV.   Zone 1 Contract: Factual Context and Agency Evaluation

### A.   Background

On August 27, 2019, the DLA issued the RFP for the Zone 1 and Zone 2 contracts, reflecting a single DLA program for indefinite delivery and indefinite quantity.  The estimated value of the Zone 1 contract was $75 million, with a five-year maximum of $562.6 million.  AR 226-27.  The RFP advised that several thousand delivery orders would be required annually in each zone, and that offerors that they could submit proposals for one or both zones, with the caveat that a single offeror could receive only one award, except in limited circumstances. AR 226; AR 228; AR 636-37. (RFP Amd. 0008.)

As noted above, the RFP established that awards would be made "to the offeror whose proposal is most advantageous to the Government considering non-price evaluation factors and price." AR 228; AR 306.  Offerors were further instructed that "non-price evaluation factors were significantly more important than price; however, as the non-price ratings of offerors became more equivalent, price became more important."  AR 303-04.

Specifically, the DLA would evaluate proposals using three factors: (1) Technical Merit, (2) Past Performance/Confidence Assessment and (3) Price. AR 304-05.

Factor 1, Technical Merit, was to be broken down into three sub-factors: (i) Product Sourcing, (ii) Distribution and Delivery, and (iii) Customer Support; the sub-factors would be weighed equally, and respectively assessed with a rating of Outstanding, Good, Acceptable, Marginal, or Unacceptable.  *See, e.g.*, AR 7251.  The subfactors' ratings would then be "rolled up" into the general rating of either Outstanding, Good, Acceptable, Marginal, or Unacceptable. *Id.*

Factor 2, Past Performance Confidence Assessment, would be assigned one rating known as the "Performance Confidence Assessment."  To make this assessment, the Government would evaluate two aspects of Past Performance: (A) Relevancy (Very Relevant, Relevant, Somewhat Relevant, or Not Relevant) and (B) Quality (Outstanding, Good, Acceptable, Marginal, Unacceptable or Neutral).  *See, e.g.*, AR 7746-47.

For Price, offerors were instructed to submit pricing information for (A) acquisitions ("PEL")[5] and (B) distribution fees[6] corresponding to specific line items. AR 226. Thus, the "Total Evaluated Price" ("TEP") reflected the sum of each offeror's aggregate acquisitions prices, aggregate distribution prices and some additional prices: "the TEP for purposes of evaluation of award was determined using a fixed formula, using aggregate pricing calculated based upon the offerors' line-item submissions for the various pricing elements." AR 310. Also, importantly, the solicitation specified that price reasonableness analysis would be conducted at the line-item level, i.e., there would be no *general* evaluation of a bidder's TEP – rather, the evaluations would be focused on the various PEL items and distribution fees, comparing the bids against one another, against historical pricing, and to the Government's negotiation objectives. *See* AR 1816-20. Pricing analysis would be conducted using "accepted price analysis methods." AR 309-10; *see also* AR 304-06 (Addendum to FAR 52.212-2). The solicitation did not require any particular method for this analysis but mentioned several types of price reasonableness evaluation methods including "comparison of offers to each other, comparison with market research, and comparison with prior procurements." AR 304-06; 309-10.

## B. The Agency's Evaluations of the Zone 1 Contract

The DLA received three timely offers for the Zone 1 contract. Following submission of the initial proposals, the DLA developed minimum and maximum price objectives across the different categories of pricing (e.g., anticipated acquisitions and distribution costs) and combined these into total aggregate minimum and maximum price objectives. *See* AR 4076-82 (Final Pricing Analysis, Zone 1); AR 4421-22 (Price Negotiation Memorandum, Zone 1).

The initial Price Submissions and Government Maximum objectives for Zone 1 were as follows:

|  | Noble | SupplyCore | XXXXXX |
|---|---|---|---|
| **PEL (Drop Ship and Non-Drop Ship)** | XXXXXXX | XXXXXXX | XXXXXXX |
| **Drop Ship Distribution Fee** | XXXXXXX | XXXXXXX | XXXXXXX |
| **Non-Drop Ship Distribution Fee** | XXXXXXX | XXXXXXX | XXXXXXX |
| ***Combined Distribution Fees (Drop Ship*** | | | |

---

[5] Acquisition prices comprise the actual invoice price of the product or incidental service paid by the prime vendor (contractor) to its sub-contractor or supplies. AR 239. The RFP included a Price Evaluation List (PEL) of 450 line items for each zone, requiring acquisition ceiling prices for 95% of the items (i.e. 428 items). AR 225. "All items offered w[ere to] be evaluated in accordance with FAR Subsection 15.404-1(b) 'Price Analysis.'" AR 310.

[6] Distribution fees were specifically defined as "fixed ceiling prices for each line item which represent all elements of the contract price other than the acquisition price."

| | | | |
|---|---|---|---|
| *plus Non-Drop Ship)* | XXXXXXX | XXXXXXX | XXXXXXX |
| *Government MAXIMUM Distribution Fees* | XXXXXXX | XXXXXXX | XXXXXXX |
| **Incidental Service Scenario** | XXXXX | XXXXX | XXXXX |
| **Storefront Scenario** | XXXXXX | XXXXXX | XXXXXX |
| **TOTAL EVALUATED PRICE (TEP)** | XXXXXXX | XXXXXXX | XXXXXXX |
| *Government MAXIMUM TEP* | XXXXXXX | XXXXXXX | XXXXXXX |

AR 1822; 4078-82.

DLA determined that all three Zone 1 offerors would be included in the competitive range.  AR 2031; AR 2093.  Discussions followed, during which offerors were asked to validate or "improve" their pricing.  *See* AR 2081-93; *see also* AR 4423-24 (PNM, Zone 1).

The DLA conducted three rounds of discussions with each offeror.  *See* AR 4078-93; *see also* AR 3108-12; 3126-29; 3147-52; 3706-25; 3728-65.  SupplyCore was asked to improve its acquisition pricing on hundreds of items for all three rounds of the discussions of the Zone 1 contract.  *See* AR 7749 (summarizing requests).  XXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.  Accordingly, during the bidding process, SupplyCore was repeatedly advised to "improve" its distribution pricing.  In Round 1, SupplyCore was advised:

➢ **Distribution Matrix (Drop Ship):**
  • For Pricing Periods 1, 2, and 3 please review and improve pricing for the following distribution tiers: XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXX.

➢ **Distribution Matrix (Non-Drop Ship):**
  • For Pricing Periods 1, 2, and 3 please review and improve pricing for the following distribution tiers: XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXX.

AR 2132.

In Round 2, SupplyCore was advised:

➢ **Distribution Matrix (Drop Ship):**
  • For Pricing Periods 1, 2, and 3 please review and improve pricing for XXX distribution tiers: XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXX.

12

- ➢ **Distribution Matrix (Non-Drop Ship):**
  - For pricing Periods 1, 2, and 3 please review and improve pricing for XXX distribution tiers: XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXX.

AR 2224.

In Round 3, SupplyCore was advised:

- ➢ **Distribution Matrix (Drop Ship):**
  - For Pricing Periods 1, 2, and 3 please review and improve pricing for the following distribution tiers: XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXX.

- ➢ **Distribution Matrix (Non-Drop Ship):**
  - For Pricing Periods 1, 2, and 3 please review and improve pricing for the following distribution tiers: XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXX.

AR 2873.  The Government's estimated maximum total price for distribution fees was XXXX XXXX.  SupplyCore's total distribution price in Round 1 was XXXXXXX; for Round 2 it was not reduced at all and stayed at XXXXXXX; for Round 3 it was XXXXXXXX; and SupplyCore's final distribution price was XXXXXXX – in the end, XXXXXX above the Government's estimated maximum.  AR 4079, 4084, 4086, 4089, 4092.

By comparison, Noble's total distribution price in Round 1 was XXXXXX; for Round 2 it was XXXXXX; for Round 3 it was XXXXXXX; and Noble's final distribution price was XX XXXX.  AR 4084; 4086; 4089; 4092.  Like SupplyCore, Noble was instructed to "review and improve pricing" for certain distribution tiers – however, distinct from the feedback to SupplyCore, DLA requested "improve[ment]" on prices in only some distribution tiers, whereas for SupplyCore, this instruction was directed to "XXX" distribution tiers.  *See* AR 2103 (Round 1); AR 2162-63 (Round 2); AR 2859 (Round 3).  By the end of the discussions process, in Round 3, Noble was asked to improve pricing for XXXXXXX Drop Ship tiers and XXXXX XX Non-Drop Ship tiers.  AR 2859.

Thus, while SupplyCore was repeatedly and broadly advised to "improve" its distribution pricing, including an emphasis that this applied to "XX" distribution tiers, SupplyCore was not warned expressly about the disparity between the Government's targeted maximum distribution fee and SupplyCore's proposed price.  In other words, DLA never made a finding (or stated) that SupplyCore's bids for the Zone 1 were unreasonably high.

For the Zone 1 contract, the SSA's Factor 1 (Technical Merit) analysis ascribed "good" ratings to both Noble and SupplyCore – however, the SSA also found Noble's proposal was stronger than SupplyCore's, namely under Subfactors 1(a) (Product Sourcing) and 1(c) Customer Support, while SupplyCore's proposal as only "slightly more favorable" than Noble's under Subfactor 1(b) (Distribution and Delivery).  *See generally* AR 4539-4567.  The SSA found that

SupplyCore's Factor 2 Past Performance Confidence Assessment rating was higher than Noble's, but that Noble's rating was "satisfactory." AR 4558, 4561-62. Ultimately, SupplyCore's higher past performance rating relative to Noble was found to "not outweigh the greater technical benefit offered by Noble's proposal, which was more important to the evaluation." *Id.*

Since Noble and SupplyCore were close regarding Factors 1 and 2, the SSA turned to Price and observed that Noble's Total Evaluated Price ("TEP"), $16.2 million, was far lower than SupplyCore's TEP of XXXXXXX, and found that SupplyCore's superior Factor 2 rating did not justify selecting SupplyCore given that SupplyCore's TEP was XXXXXX higher than Noble's technically superior proposal. *See* AR 7756. Therefore, the SSA awarded the Zone 1 contract to Noble over SupplyCore. AR 4562, 4567.

The contracts for both Zone 1 and Zone 2 were awarded in May 2021. SupplyCore requested and received two rounds of debriefing for each of the two contracts. *See* AR Tabs 281, 282, 289, 291. SupplyCore then filed bid protests of both contract awards with the GAO, which the GAO denied. AR 7734-70 (Zone 1); AR 8427-63 (Zone 2).

While SupplyCore's bid protest remains pending, SupplyCore is currently performing as the incumbent contractor in both Zone 1 and Zone 2. The Zone 1 and Zone 2 contracts originally expired on October 25, 2019, but SupplyCore has continued performance under non-competitive bridge contracts awarded under 10 U.S.C. § 2304(c)(1). AR 142. The bridge contracts are set to expire on January 15, 2022. *See* ECF No. 15 at 2.

## V.     Zone 1 Contract: Discussion

SupplyCore makes three allegations purportedly foreclosing DLA's award of the Zone 1 contract to Noble as arbitrary, capricious or irrational. Two of the allegations are linked: SupplyCore alleges (1) that no adequate price reasonableness analysis was conducted by DLA, or only occurred for awardees (*see* ECF No. 29 at 13); in the alternative, SupplyCore argues (2) that if a reasonableness analysis had been conducted (or if the Court finds that such an analysis was, in fact, conducted), SupplyCore's bid should have been found unreasonably high. *Id.* at 14. In addition, SupplyCore also argues that the discussions underlying the award for the Zone 1 contract were not meaningful. *Id.* at 16.

### A.  DLA Conducted Sufficient Price Reasonableness Analysis.

SupplyCore points out that the Solicitation commits the DLA to price reasonableness evaluations of offerors' PEL prices, distribution fees and other fees (*see* AR 309-10) with the implication that DLA breached this requirement. Specifically, SupplyCore contends that while the DLA might have "analyzed" offerors' prices, this "does not satisfy the requirement to *evaluate* the offers for price reasonableness" (emphasis added). ECF No. 33 at 4. SupplyCore then further emphasizes that "SupplyCore is entitled to have the Government point to evidence that it actually considered whether SupplyCore's pricing was reasonable or not, which the Government cannot do." ECF No. 33 at 5. SupplyCore is particularly looking for a reasonableness evaluation of its XXXXXXXX distribution fees, because this "constituted the lion's share of each offeror's TEP." ECF No. 33 at 5.

14

However, the Government cites considerable evidence that the DLA did adhere to the solicitation's requirements for conducting price reasonableness review.   For example, DLA certainly appears to have evaluated price reasonableness at the line-item level, and rating and comparing prices.   *See* ECF No. 35 at 2; *see also* AR 1814-22; 4074-92; 4558-4567.

In addition, SupplyCore seems to suggest a distinction between "analysis" and "evaluation," whereby, allegedly, the Government engaged in analysis but never reached any conclusion regarding whether it considered any offeror's pricing to be reasonable or unreasonable. ECF No. 33 at 4.   However, the Administrative Record certainly shows that the agency did make final determinations, determining, SupplyCore included, that the pricing was fair and reasonable.   *See, e.g.,* ECF No. 35 at 3, citing AR 4413, 4415-17, 4505-07, 4509.   Nor is the Government required to point to evidence that it considered in making its reasonable determination as (1) the solicitation did not have a requirement for a formal determination of price reasonableness, and (2) FAR 15.404-1(b) does not impose a documentation requirement. *DynCorp Int'l,* 10 F.4th at 1313.

In addition, SupplyCore argues that the required threshold for a legally sufficient price reasonableness analysis is not met when an offeror bases its pricing on incorrect information. *See* ECF No. 29 at 13 ("An agency's failure to conduct a required price reasonableness analysis is prejudicial and requires that the award be set aside and the procurement be reopened for a price reasonableness review (citing *Caddell Constr. Co. v. United States*, 125 Fed. Cl. 30, 56 (2016)).  SupplyCore's reliance on *Caddell* implies that DLA's price analysis or evaluation process and/or the administrative record of this process was superficial, purportedly failing to demonstrate a proper analysis or evaluative process.  But the Government has demonstrated (and SupplyCore concedes (*see* ECF No.33 at 4)) that DLA really did conduct a price analysis.  This fact fundamentally and severely undermines SupplyCore's arguments.  While SupplyCore vehemently argues that DLA's representations about pricing are inadequate for price reasonableness purposes, the fact is that DLA did repeatedly and broadly convey to SupplyCore that its distribution fees were too high.  *See* AR 2132, 2224, 2873.  Furthermore, in response, SupplyCore mostly declined to lower its distribution prices, while at the same time Noble XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXX.[7]  Also, as a matter of law, the Government generally enjoys broad discretion with the manner in which it conducts and records price analysis and price reasonableness evaluations.

---

[7] SupplyCore's initial total distribution price was XXXXXXX.  With Round 1, the distribution price was lowered to XXXXXXX, and this was kept level with Round 2.  With Round 3, SupplyCore lowered its distribution price to XXXXXXXX, and then its final distribution price was XXXXXXX. AR 4078-4092.  Thus, SupplyCore reduced its price by XXX XXXXX.  In contrast, Noble, which received narrower instructions to lower its distribution fee pricing than SupplyCore, reduced its distribution fees by a total of nearly XXXXXXX. Noble's initial distribution price was XXXXXXX. With Round 1 this was lowered to XXXXXXX. With Round 2 was lowered to XXXXXX, then to XXXXXXX with Round 3, and followed by a final distribution price of XXXXXX.  *Id.*

For these reasons, the Court holds that SupplyCore has not undermined the sufficiency of DLA's price reasonableness analysis or evaluations. The Court now moves to the question of whether that analysis should have found SupplyCore's pricing "unreasonable."

### B. DLA's Price Reasonableness Evaluation Was Not Bound to Find SupplyCore's Distribution Pricing Unreasonable.

SupplyCore argues that had a price reasonableness evaluation been conducted (or if the Court finds that such an evaluation was in fact conducted), its distribution fee pricing would and should have triggered an "unreasonable" finding, as well as a requirement that SupplyCore be apprised of this finding. *See, e.g.*, ECF No. 29 at 14-15. The Government does not disagree that if such an "unreasonable" price finding had been made, there may have been a requirement to notify SupplyCore, but also highlights the fact that DLA repeatedly and broadly instructed SupplyCore to improve its distribution prices. *See, e.g.*, ECF No. 33 at 14.

The Court agrees that, as suggested by the Government, *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300 (Fed. Cir. 2020), is "instructive" in this case. In *DynCorp*, six offerors submitted proposals. DynCorp, which was not selected for award, was initially found to have submitted a decent but not distinctively good technical proposal, and also proposed much higher prices than the other offerors. *Id.* at 1306. DynCorp moved to challenge the award on the basis that the solicitation indisputably required price reasonableness to be evaluated for all offerors, contending that this had not transpired. *Id.* at 1307. The Army postponed the bid protest and undertook an additional review of all six offers for price reasonableness, and then reconfirmed its decision, declining to reopen discussions having found that the prices of all six offerors were reasonable, despite a very wide range of pricing. *Id.* In other words, the Army determined that each offeror's price was reasonable for its respective and distinct technical approach. *Id.* DynCorp objected, contending that there should have been a simple proposal-to-proposal price comparison, but the Court disagreed, finding that pricing regulations included no such requirements. *Id.* at 1316. The Court concluded that while DynCorp's price was high, the price was not unreasonably high given its distinct technical approach; therefore, it upheld the Army's award. *Id.* at 1317.

Critically, in this case, GAO highlighted the apparent fact that SupplyCore's approach – specifically with respect to its distribution proposal – was distinct from Noble's, the awardee. *See* AR 7765 (citing AR 7255). As noted above, SupplyCore's original bid protest before the GAO alleged that its XXXXXXXX distribution fee proposals reflected SupplyCore's purported knowledge of the Agency's "actual needs," and that "Noble's proposal does not reflect the actual needs of the Agency and the pricing of the resulting contract will not properly reflect the actual price to be incurred by the Agency and will ultimately result in greater cost to the Government." *Id.*

SupplyCore argues that *DynCorp* stands for the proposition that if there is a major disparity in pricing, "unreasonable" pricing is indicated. However, the Government correctly states that as presented in *DynCorp*, disparity in prices "is a function of a competitive procurement, not a fundamental problem." *See* ECF No. 31 at 23 (citing *DynCorp*, 10 F.4th at

1314).   In other words, "the Army determined that each offeror's price was reasonable for its chosen technical approach, notwithstanding disparities in pricing." *Id.* at 1316.   The Federal Circuit ultimately found that "DynCorp's proposed price was high[, b]ut it was not unreasonably high for the technical approach it proposed." *Id.* at 1317.   Thus, *DynCorp* cannot be read as supporting the proposition that the magnitude of a discrepancy (alone) establishes that a reasonableness determination has not been made.   As with the protestor in *DynCorp*, SupplyCore's XXXXXXXX distribution fee pricing reflects its chosen approach – by SupplyCore's own account.   *See* AR 7765 (citing AR 7255).   Also, in addition, the GAO opinion presents an emphatic and thorough general rejection of the argument that "magnitude of the [price] disparity" should trigger "unreasonable" price findings.   *See* AR 7759-7760 (addressing "magnitude of the disparity" arguments with respect to "meaningful discussions" analysis).

SupplyCore also invokes *Serco Inc. v. United States*, 81 Fed. Cl. 463, 495 (2008) to make an additional argument that SupplyCore should have been informed that its pricing was unreasonable.   In short, SupplyCore construes *Serco* as establishing a putative framework for findings that a given price may be an "outlier," which in turn, purportedly, may trigger an "unreasonableness" finding.   *See* ECF No.29 at 15.   As presented, this "outlier" argument applies to unreasonableness findings based on (A) prices of offerors relative to one another (addressed above vis-à-vis *DynCorp*), but also (B), "outlier" status relative to the Government's maximum Total Evaluated Price ("TEP") objectives.   *Id.*

Discussing the applicability of *Serco* requires some factual excavation of that case. Underlying *Serco* was a solicitation awarded by the GSA to provide technology products and services to the entire Federal Government.   *Serco*, 81 Fed. Cl. at 465.   The solicitation specified that technical factors would be "significantly more important than cost or price," but also added that "the closer the technical scores of the various proposals are to one another, the more important cost or price considerations become in determining the overall best value for the government." *Id.* at 466-67.   The solicitation yielded 62 offerors whose bids, if technically proximate, were supposed to be evaluated for price.   *See id.* at 465-67.   GSA also prepared an "Independent Government Cost Estimate" (IGCE).   *Id.* at 473.   The GSA selected 29 awardees, including the 28 offerors with the best technical proposals. *Id.* at 477.   The prices of the offerors (and the awardees) were wildly disparate, ranging from well beneath the ICGE to far above it – some awardees' prices were more than double the price of the lowest-priced awardee. *Id.* at 492. GSA purportedly evaluated every offered price as "fair and reasonable," and also issued awards to the 59th, 60th, and 61st-highest bidders out of 62 (i.e., three of the four highest of the 62 offers were selected). *Id.* In conjunction with this, every price analysis concluded: "In relation to the IGCE for overall price and Mean Overall Price among all offerors (Government and Contractor Site combined over 10 years), the Offeror's Mean Overall Price is in line with adequate price competition and is, therefore, considered fair and reasonable." *Id.* at 495.   In other words, despite the dramatic variance in the pricing among the different offers and also between the offers and the IGCE, GSA still represented, uniformly, that each offeror's pricing was "'in line with adequate price competition' 'even when [GSA's] own statistics demonstrated they were not.'" *Id.*   The Court held that this clearly illogical representation triggered a decision that GSA's price reasonableness analysis was arbitrary and capricious because, apparently, there "was no price reasonableness analysis at all." *Id.*   Pertinent to SupplyCore's argument, in this

context, the Court referred to some of the prices which GSA found "fair and reasonable" as "outliers." *Id.* at 492, 495. However, in fact, the *Serco* Court's finding that GSA's price reasonableness analysis was arbitrary and capricious obviously hinges on a contradiction in the agency's finding: the finding espoused to reflect "the IGCE for overall price and the Mean Overall Price among all offerors" and then found each offeror's pricing fair and reasonable in relation to these – which is difficult to rationalize given the actual range and volatility of all the offerors' pricing.

Thus, *Serco* discusses "outlier" prices with respect to the mean price among all offerors and also when comparing offerors' pricing to the IGCE. The Court took notice of these "outlier" prices in conjunction with the GSA's facially problematic finding that each and every offeror's price was "in line with adequate price competition."

SupplyCore does not argue that the Government was bound to disclose or strictly apply its maximum pricing for the Zone 1 contract (or the distribution costs thereof) but takes the position that its distribution fee pricing constituted an "outlier": relative to the Government's maximums. *See* ECF No. 29 at 15. Thus, drawing on *Serco*, SupplyCore suggests a per se rule: "prices that are outliers are unreasonable on their face." ECF No. 33 at 8.

SupplyCore's suggested analogy to *Serco*, suggesting an "outlier" framework for relatively high prices, is inapt. As the Government notes, the *Serco* decision "does not purport to impose a bright-line rule that the mere presence of outlier prices renders a price proposal unreasonable per se." *See* ECF No. 35 at 6. Moreover, here, unlike the agency in *Serco*, DLA made no representations to SupplyCore about reasonableness relative to the agency's estimate or maximum pricing. But DLA did evidently conduct price reasonableness analysis and conveyed this to SupplyCore. In contrast to the DLA here, in *Serco*, GSA's price reasonableness finding made a facially erroneous representation with express reference to the Government's estimate, indicating that no price reasonableness analysis had actually taken place.

The Court holds that SupplyCore has not demonstrated that DLA should have found its distribution pricing unreasonable.

### C. The Discussions Between SupplyCore and DLA Were Meaningful.

SupplyCore levies a series of arguments that DLA arbitrarily and capriciously failed to conduct meaningful discussions with SupplyCore, but these arguments are not convincing.

The Government's position essentially has three steps. First, the Government highlights the relatively low legal bar for "meaningful discussions: "[D]iscussions are meaningful if they generally lead offerors into the areas of their proposals requiring amplification or correction, which means that discussions should be as specific as practical considerations permit." *WorldTravelService v. United States*, 49 Fed. Cl. 431, 439 (2001) (quoting *Advanced Data Concepts, Inc. v. United States*, 43 Fed. Cl. 410, 422 (1999), *aff'd*, 216 F.3d 1054 (Fed. Cir. 2000)); *accord Carahsoft Tech. Corp. v. United States*, 86 Fed. Cl. 325, 343 (2009). However, "it is well-accepted that 'agencies are not obligated to conduct all-encompassing discussions, that is, to address in express detail all inferior or inadequate aspects of a proposal.'" *Banknote Corp.*

*of Am., Inc. v. United States*, 56 Fed. Cl. 377, 385 (2003) (citation omitted), *aff'd*, 365 F.3d 1345, 1356-57 (Fed. Cir. 2004).  Agencies are "not required to 'spoon-feed' offerors in order to have meaningful discussions."  *Carahsoft*, 86 Fed. Cl. At 343.  "Rather, the agency should tailor its discussions to each offer, since the need for clarifications or revisions will vary with the proposals."  *WorldTravelService*, 49 Fed. Cl. at 439.

Second, the Government zeroes in on the legal requirements to clear this relatively low bar: "The FAR only requires a contracting officer to discuss 'deficiencies and significant weaknesses.'"  FAR 15.306(d)(3).  Beyond this required minimum, the Government explains, "the precise content of discussions is largely a matter of the contracting officer's judgment."  *Patriot Taxiway Indust., Inc. v. United States*, 98 Fed. Cl. 575, 587 (2011).  "The contracting officer has broad discretion in conducting discussions."  *Advanced Data*, 43 Fed. Cl. at 422; FAR 15.306(d)(3) ("The scope and extent of discussions are a matter of contracting officer judgment.").

Third, the Government contends that DLA did not run afoul of this requirement to discuss "significant weakness" or "deficiencies"[8] because SupplyCore's distribution fees under the circumstances did not meet the definition of "significant weakness" or "deficiency."  Following the principles of *DynCorp*, the Government explains that "a price that is too high, but not unreasonably high, fails to meet the definition of either a deficiency or a significant weakness."  *See* ECF No. 31 at 23, 26, 29.  The Court finds this position persuasive.  The Government further disputes the possibility that DLA's discussions with SupplyCore were not meaningful by couching SupplyCore's responses to DLA's feedback as a function of business judgment rather than inadequate information:

> [W]hereas its competitors heeded the Government's directives to improve pricing in each of the three rounds of discussions, SupplyCore eschewed the Government's admonition and largely elected not to improve its pricing in the second round of discussion (only in the first and third rounds).  Given these facts, there is no reason to believe that SupplyCore would have sufficiently lowered its price to place it in line for award, even had the agency directly advised SupplyCore of the agency's negotiation objectives.  Instead, as SupplyCore's comments make clear, SupplyCore's pricing was the product of its own business judgment, not of agency action or inaction.

*See* ECF No. 31 at 33.  The Court finds this perspective correct.  As noted above, DLA advised SupplyCore to "review and improve pricing for XX distribution tiers: XXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX" and repeated this instruction each Round.  AR 2132, 2224, 2873.  In response, SupplyCore lowered its distribution prices from XXXXXXX (initial price) to XXXXXXX (final price).  AR

---

[8] A "[d]eficiency" is defined as "[a] material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable risk."  FAR 15.001.  A "[s]ignificant weakness" is defined as "[a] flaw in the proposal that appreciably increases the risk of unsuccessful contract performance."  *Id.*

4084, 4086, 4089, 4092.  Noble, which received more moderate, narrower instructions to reduce its distribution pricing, lowered its distribution pricing from XXXXXXXX (initial price) to XXXXXX (final price).  *Id.*  Because SupplyCore's cuts were so modest, the Government suggests that this Court should be skeptical of SupplyCore's current assertions that in response to alternative instructions, it would have made significant cuts to its distribution fee prices.

In response, SupplyCore emphatically opposes the Government's account of its pricing decisions, but does not succeed in convincing this Court that DLA's discussions were less than meaningful.  Central to these meaningful discussions arguments, SupplyCore agrees the Government that FAR 15.306(d)(3) represents a key baseline requirement for discussions, whereby an agency is bound by law to discuss "deficiencies" and "significant weaknesses."  *See, e.g.*, ECF No. 33 at 9.

SupplyCore spends surprisingly little time arguing that its distribution pricing in fact constitutes a "significant weakness," and seems more preoccupied with the implications which follow, should such a finding be made.  *See, e.g.*, ECF No. 33 at 9-11.  In any case, the crux of SupplyCore's argument that its distribution pricing constituted a "significant weakness" is the disparity between DLA's maximum objectives and SupplyCore's pricing.  *See* ECF No. 29 at 16. But SupplyCore cites no cases where prices above the Government's maximum objectives or estimates were construed as "significant weaknesses" directly for that reason.  SupplyCore does cite *DynCorp* for the proposition that offerors' "unreasonably high prices" must be discussed. ECF No.33 at 9.  However, for reasons reviewed above, the Court finds this completely unconvincing because *DynCorp* establishes that high prices above the Government's maximum or estimate may not be unreasonable if they reflect an offeror's chosen technical approach. *DynCorp,* 10 F.4th at 1316-17.  Also, again, the GAO ruling in this case already highlights the fact that SupplyCore, the incumbent contractor, feels that it is more aware of the Government's "actual needs" than other offerors.  This suggests that SupplyCore's bid appears to have reflected a different approach, like the protesting high bidder in *DynCorp*.  AR 7765. The Court finds that *DynCorp* cannot be credibly invoked to interpret SupplyCore's distribution fee pricing as a "significant weakness," or to otherwise prove that DLA's discussions were less than meaningful.

Beyond this, SupplyCore also argues against meaningful discussions on the basis that DLA's instruction to "improve" pricing was misleadingly understated.  *See* ECF No. 29 at 18. This argument again runs into the reality that DLA repeatedly and broadly instructed SupplyCore to improve its distribution fees, and that SupplyCore mostly disregarded the instruction, especially in conjunction with Noble's responses (reductions) to narrower DLA instructions to "improve" distribution pricing.  *See* AR 2132, 2224, 2873; 4078-4093.

Finally, SupplyCore points out an apparent inconsistency: if, in the Zone 2 discussions, DLA informed PAE that its distribution fee pricing "**cannot be determined fair and reasonable**," why was a similar instruction not conveyed to SupplyCore in the Zone 1 contract discussions?  *See* ECF No. 33 at 11-12.  This again raises the issue underlying *DynCorp*.[9]  The

---

[9] *DynCorp* does not embrace proposal-to-proposal price comparisons because of differences in offerors' technical approaches.  *DynCorp*, 10 F.4th at 1316.  In other words, the

Court is additionally disinclined to assess "meaningful discussions" in Zone 2 using DLA's Zone 1 Round 3 representation to PAE because of how the solicitation effectively separates the Zone 1 and Zone 2 contracts, stipulating that one contractor almost certainly cannot win both bids.  AR 226; AR 228; AR 636-37.  For this reason and because of this Court's reading of *DynCorp*, DLA's Round 3 discussions with PAE for the Zone 2 contract is not enough to render the Zone 1 discussions less than meaningful.  In other words, the two contracts were sufficiently distinct to preclude application of a rigid consistency requirement.

Again, challenging a procurement award requires a showing that the agency action in question was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A).  SupplyCore has not established that DLA's award of the Zone 1 contract to Noble instead of SupplyCore meets this threshold.  Specifically, SupplyCore has not convinced this Court that DLA's evaluation of the Zone 1 distribution fee pricing proposals constituted a "significant weakness" for the purposes of meaningful discussions requirements, nor that DLA's Zone 1 representations to SupplyCore otherwise fell short of "meaningful discussions."

## VI.   Conclusion

For the reasons set forth above, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motion for Judgment on the Administrative Record.  With respect to the Zone 2 Contract, the Court **GRANTS** Plaintiff's request for a declaratory judgment and Motion for a Permanent Injunction.  The Court **ENJOINS** the DLA from continuing performance on the Zone 2 contract awarded pursuant to the solicitation at issue in this protest and **DIRECTS** the DLA to cancel the contract awarded to PAE.  With respect to the Zone 1 Contract, the Court **DENIES** Plaintiff's Motion.

The Court further **GRANTS IN PART AND DENIES IN PART** Defendant's Cross Motion for Judgement on the Administrative Record.  With respect to the Zone 2 contract, the Court **DENIES** Defendant's Cross-Motion.  With respect to the Zone 1 contract, the Court **GRANTS** Defendant's Cross-Motion.

---

fact that the price of Proposal A is higher than that of Proposal B does not foreclose the possibility that relative to what each Proposal entails, Proposal A may be reasonably priced while Proposal B – while lower than Proposal A – conceivably may be unreasonably priced.  *See id.* (rejecting proposal-to-proposal price comparisons for review of price reasonableness).  In this case, the Zone 2 contract appears to approximately feature such a scenario, which does not necessarily even come close to provoking an arbitrary, capricious or irrational finding.  However, there is the additional detail that in the Zone 2 discussions, after less expensive Proposal B's price (PAE's) was found unreasonably high, the contractor (PAE) declined to lower the price – keeping it "unreasonable" by the Government's assessment – and then in spite of this, the agency awarded Proposal B the contract.  The Zone 1 contract, however, approximately features this same scenario *without* the additional twist where the proposal with "unreasonable" pricing is awarded the contract.  Thus, the Zone 2 and Zone 1 awards represent distinct scenarios.

The Court further **DENIES** Defendant-Intervenor PAE's Cross-Motion for Judgment on the Administrative Record.

The Court also **GRANTS** Defendant-Intervenor Noble's Cross-Motion for Judgment on the Administrative Record.

The Clerk is directed to enter judgment accordingly.

The parties are directed to file redactions **within ten (10) days** of the date of this Opinion and Order.

**IT IS SO ORDERED.**

<u>s/Edward J. Damich</u>
EDWARD J. DAMICH
Senior Judge